Hofstadtee, J.
(dissenting). In my opinion the final order in favor of the tenants should be affirmed.
Willis Watson is a respondent in name only—he does not reside in the premises, being in jail. The other respondent, Flora Watson, his Avife, occupies the apartment with her four *620 children. The family has been living in the Stephen Foster Homes project since May, 1952 under a written lease for a term of one month automatically renewable for successive monthly terms of one month each unless terminated on one month’s written notice.
The New York City Housing Authority, landlord, is a public housing agency authorized to construct low-rent public housing-projects by the Public Housing Law of the State of New York (Public Housing Law, art. III). Pursuant to the statute, it has adopted and filed resolutions governing the removal of tenants on the ground of undesirability; it is otherwise exempt from the provisions of the Emergency Housing Rent Control Law (L. 1946, ch. 274, as amd., § 2, subd. 2, par. [e]; § 5, subd. 4).
Sometime in early 1959, the manager of the project, purporting to act under these resolutions, made an initial finding that the respondents were ineligible for further residence at a city housing- project. This action was approved and ratified by appellant’s tenant review board, and Mrs. Watson was notified of the termination of her tenancy. The sole basis disclosed by the record for this finding was Mr. Watson’s conviction for crime and his incarceration. Upon failure of Mrs. Watson and her children to vacate, this summary proceeding was instituted under subdivision 1 of section 141(1 of the Civil Practice Act.
The landlord’s position, both at the trial and on this appeal, is that the lease was duly terminated by its administrative proceedings (no transcript of them, however, was introduced in evidence) and that it was not bound by the provisions of subdivision 6 of section 1410 of the Civil Practice Act which require a landlord, upon seeking to evict an allegedly objectionable tenant, to submit proof of such objectionability before a final order of eviction may be issued.
The Justice below declined to evict the Watson family; but my brethren would reverse this holding. I dissent. I cannot join in a ruling which makes the assumption in law that a finding without support in the record can determine jurai rights. This record does not afford a shadow of excuse in law any more than in logic or morals to warrant eviction of the present occupants.
I need not affect not to know as a Judge what I know as a man. “ It is clear now that postwar America’s greatest single social scandal has been its failure to provide adequate housing for its low-income groups. Less than half of the federal public housing units authorized by Congress in 1949 under Public Law 171 had been built by 1959 * * *. The result * * * is that no less than 13 million American families are now slum *621 dwellers. That is to say, more Americans now live in slums than on farms.” *
In 1959 a housing expert, testifying before a United States Senate Committee said that the Public Housing Program had become 11 little more than an adjunct of the publicly subsidized private urban renewal program. This urban renewal program, while it does help cities to get rid of slums, has developed into a device for displacing the poor from their' footholds to make way for higher rental dwellings which those displaced cannot afford. Thus, the lowest-income family remains the forgotten family, though it is still the most home-needy in the American family circle.” * Razing dwellings housing low-income groups is constantly in progress to make room for luxury projects in our city. Recently this process was condemned unanimously in a resolution by the City Council. There are 700,000 fewer controlled apartments now than when the State Rent Control Law went into effect in 1950.
The Housing Authority’s very creation stems directly from a legislative finding to the effect that “ insanitary and substandard housing conditions owing to overcrowding and concentration of the population, improper planning, excessive land coverage, lack of proper light, air and space, insanitary design and arrangement, or lack of proper sanitary facilities ” are prevalent and that such conditions are a “ menace to the health, safety, morals, welfare and reasonable comfort of the citizens of this state ”. (Public Housing Law, § 2.)
This expression by the Legislature is but an implementation of the general belief that improper housing is conducive to deviant behavior (see Newmeyer, Martin H., Juvenile Delinquency in Modern Society). Various home rating and housing scales have been devised to measure the effects of housing on family life, and while methods have differed, all have reached the conclusion that problem behavior is more prevalent where physical environmental conditions are bad (see Blueck, Sheldon and Eleanor, Unraveling Juvenile Delinquency; 1950, The Commonwealth Fund, pp. 84-88). From all this, it may be assumed that it was the legislative purpose to provide proper homes for lower-income groups, and to this end authorities such as the appellant were given the breath of life.
To achieve this purpose certain powers were granted to these authorities for their proper operation, including that of making-rules, by-laws and regulations to assure proper administration (Public Housing Law, § 37). It is implicit in such grant that they would be fair and reasonable, and so applied so as to pre *622 elude arbitrary and iujust treatment of tenants. Oppressive or capricious applications of such regulations would be contrary to the caveat incorporated in section 37, that the Authority’s powers may not be utilized in a manner “ inconsistent with the provisions of this chapter ’ ’. The Authority may set reasonable standards of desirability and press their enforcement. But to permit an Authority the right to evict merely on the issuance of its ukase, without more, pronouncing a tenant objectionable, shocks the conscience.
In public statements the Authority has expressed its concern over behavior of tenants, which menaces other residents of its projects (see New York Times, Jan. 30, 1957, p. 23, col. 5); it has defended its evictions of parents who cannot control their children (id. March 2, 1958, p. 64, col. 5) on the ground that its projects must provide “ a reasonably decent place for raising kids.” (Id. March 4, 1958, p. 58, col. 1.) (For an alternative method of handling this problem, see the Report of the City Housing and Planning Council of New York, id., June 9, 1958, p. 1, col. 2.) ■ But here the present tenancy imposes no threat to the others in the community. Were the father of the family here involved not removed from the scene there might have been a basis for appellant’s determination. The cited cases are not pertinent. In both New York City Housing Auth. v. Greenbaum (1 Misc 2d 138) and New York City Housing Auth. v. Russ (1 Misc 2d 170) the determination of nondesirability was on authorized bases; and the actual tenants were themselves the objectionable individuals. Conduct which is not shown to be detrimental to the health, safety or morals of others is an improper basis for eviction. (See Matter of Sanders v. Cruise, 10 Misc 2d 533, where eviction of a narcotics addict was not permitted.) " :
Every presumption of fact and law must be made in favor of the validity of the order under review. For, housing legislation was enactéd in our State to stem the ravages of a critical housing shortage.** The preservation of its .underlying philosophy and the maintenance of the high public interest entailed, forbid the eviction of this family. It would offend the spirit *623 of laws which declare that action is “ imperative ” to prevent “perils to health, safety and welfare” (Emergency Housing Bent Control Law, § 1); and of decisions which hold that,: “ In the residential rent law there is a higher public interest protected and a different class of persons for whose benefit the State has chosen to exercise its police power ” (Garay v. Todros, 282 App. Div. 126, 127). Plainly an eviction here runs counter to the purposes of the very statute which gave the petitioner life. An act intended to provide housing for the poor is misused when a family is driven from its home for no better reason than that it had been sorely afflicted. Neither reason nor principle requires us to make a mockery of the law.
The record is barren of any showing that the tenant in possession is undesirable; it shows only that she is unfortunate — that she and her children eat the bread of affliction. To be sure, her husband is undesirable; but he does not live in the apartment—he is in jail. Are not his wife and children already suffering sufficient punishment? Why should this court add to their burden by evicting them? To put this family into the street at this time and thus by-pass the social consequences which must result therefrom, would be inconsistent with the avowed public policy of this State as expressed through its Legislature. When a public authority loses sight of its purposes, the courts should properly intercede. Though much emphasis is placed by the appellant on immunities conferred upon it, it is clear that they were conferred to effect the purpose of the Public Housing Act—none contrary and detrimental to its purposes may be inferred.
It is significant that appellant while claiming immunity from subdivision 6 of section 1410 of the Civil Practice Act, has *624 based its authority for bringing this summary proceeding on subdivision 1 of the same section. However, to permit it to treat this as an ordinary holdover proceeding on the ground that it has terminated the tenancy in accordance with the terms of the lease while lurking in the background is the spectre of a situation for which subdivision 6 was designed, would be affording it a status not intended explicitly or inferentially by the Legislature. The lease here involved is no ordinary lease expiring at the end of a term. This lease renews itself automatically from month to month, so that it has the aspect in many respects of a lease for an indefinite term. In such situation, and in view of the general purposes of public housing, the termination of the lease should only be permitted on reasonable grounds.
The Authority is not exempt from rent control to the extent that it may be considered or. consider itself outlaw. Except as it is explicitly immunized it must be held to be bound by principles and provisions of law intended for the protection of the home-needy. It was not contemplated ever that such tenants should be subject to arbitrary removal. Processing must be fairly conducted; not only as a matter of law but because it is a contractual obligation—by virtue of the incorporation of the provision for such processing in the lease. Indeed, in this view this proceeding is within subdivision 6 of section 1410- of the Civil Practice Act even if that subdivision of that section were otherwise not applicable. This conclusion is borne out by the fact that the Authority itself made its resolutions and procedures part of its own affirmative case on the trial below.
In any event, it is fatuous to suggest that all the Authority need do is to establish that it went through the forms of a procedure and that the tenant may not contest an ensuing finding of undesirability. The administrative processes invoked have no significance; for, to be effectual, a procedure must be ‘ ‘ meaningful, fair, and decent. ’ ’ That relied on here was none of these things. If such a finding is entirely devoid of any evidence to sustain it, it is as if there had been no procedure at all (Thompson v. Louisville, 362 U. S. 199).*** The concept *625 that because a procedure was adopted and its forms nominally followed, its application is beyond scrutiny, is as Avithout validity as it is disturbing—it is hostile to our tradition of due process as the law of the land.
Finally, the contemplation of the noisome housing conditions in our midst suggests that the time has come when officials and citizens should consider the advisability of legislation requiring a license as a condition to the acquisition and ownership of housing for the poor. Among other advantages, such a system Avould outlaAAT elusive absentee landlordism, which flouts the law, flees the jurisdiction, and congests the courts — requiring ever more court facilities at the taxpayers’ expense.
Tilzeb, J., concurs Avith Steuer, J.; Hoestadter, J., dissents in opinion.
Final order reversed, etc.

 Slums, Old and New, by Michael Harrington, Commentary, Aug., I960.

 In 1986, the Empire State adopted the first statute in America for public aided housing. On its 30th anniversary, an interesting note of the circumstances of its enactment was recorded:
“During 1925 the State Commission on Housing and Regional Planning * ** * worked on a program to promote publicly assisted low-rental * * 6 housing. Their report together with a bill 9 * * was transmitted to the Legislature early in 192.6 by Gov. Alfred E. Smith * * *. The bill was introduced by Senator Downing and Assemblyman Block 9 * *. Vigorous opposition developed among real estate interests * * *. The legislative
*623 leaders * * * objected * * ®. A bill meeting the conditions * * * was introduced by Senator Nicoll and Assemblyman Hofstadter 3 3 ®.
“After a heated .exchange between the Governor and Legislature * s the Governor invited Messrs. Nicoll, Hofstadter and (Harold) Riegelman to confer with him, Mr. (Julius Henry) Cohen and Bella Moskowitz. This conference resulted in minor changes in the text of the Nieoll-Hafstadter bill, its enactment and signature by the Governor. ® ® *
“It soon became apparent that Government subsidy was plainly necessary. This was provided in 1933 by the National Industrial Recovery Act and later became permanent policy under the Housing Act of 1937, sponsored by the late Senator Robert 3?. Wagner. Then in 1938 the New York State Constitutional Convention paved the way for additional programs of state and city aided public and private housing.
“ There’s a long, long trail to be traveled before the low-income and middle-income families in this state are properly housed. * * * ” (From a letter to The New York Times, Aug. 29, 1956 by Ira S. Robbins, Executive Vice-President of the Citizens’ Housing and Planning Council, Inc.)

 In this ease the court said: “ The ultimate question presented to us is whether the charges against petitioner were so totally devoid of evidentiary support as to render his conviction unconstitutional under the Due Process Clause of the Fourteenth Amendment. Decision of this question turns not on the sufficiency of the evidence, but on whether this conviction rests upon any evidence at all”, and concluded: "Just as ‘Conviction upon a charge not made would be sheer denial of due process,’ so is it a violation of due process to convict and punish a man without evidence of his guilt.” (362 U. S. 199; 206.)